UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| EASTERN AVENUE SOBER LIVING, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 5:24-cv-00330-GFVT |
| v. | ) ) | |
| | ) | **MEMORANDUM OPINION** |
| CABINET FOR HEALTH AND FAMILY SERVICES, *et al.*, | ) ) ) | **& ORDER** |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on a Motion to Dismiss filed by the Cabinet for Health

and Family Services. [R. 6.]  In the Cabinet's view, the Plaintiffs have failed to adequately plead

a claim upon which relief can be granted.  The Cabinet also seeks dismissal on the bases of

insufficient process, insufficient service of process, and failure to prosecute.  For the reasons that

follow, the Cabinet's Motion to Dismiss **[R. 6]** is **GRANTED**.

**I**

Plaintiff Vernon Pressley owns and operates Eastern Avenue Sober Living Inc., an

eleven-bed drug rehabilitation center located in Lexington, Kentucky.[1]  [R. 3 at 3.]  Eastern

Avenue was initially approved as a Medicaid provider by the Kentucky Cabinet for Health and

Family Services to operate a Tier III Behavioral Health Services Organization (BHSO)

---

[1] In Paragraph 11 of the First Amended Complaint, the Plaintiffs state "[t]he unlawful acts and practices alleged herein occurred in Hernando County, Florida which is within this judicial district." [R. 3 at 3.]  This appears to be a clerical error on the part of Plaintiffs' counsel and does not align with the remainder of the factual allegations in the complaint.  However, because it does not impact the substance of the allegations in the Complaint or play a necessary part in its dismissal, we need not discuss it further.

beginning on January 4, 2021. [*Id*. at 8.]  During this time, Eastern Avenue states that it served "over 50 Medicaid enrollees" at its facility. [*Id*.]  Shortly thereafter, Vernon Pressley collaborated with his daughter, Chantelle Pressley, to establish Winter Garden Sober Living Inc., which sought to extend the same sort of services Eastern Avenue provides to another region of Lexington, Kentucky. [*Id*. at 10-11.]  Winter Garden's operations began on February 15, 2022. [*Id*. at 11.]  Like Eastern Avenue, Winter Garden applied for and was issued a Medicaid provider agreement with the Cabinet. [*Id*.]

On November 14, 2022, the Cabinet notified Plaintiff Vernon Pressley and Eastern Avenue that it was terminated as a Medicaid provider. [*Id*. at 3.]  At the time of the termination, the individual Defendants were each an employee of the Cabinet. [*Id*. at 4-7.]  Defendant Sapna Sairajeev served as the Human Services Program Branch Manager with the Department for Medicaid Services (DMS) and Defendant Angela Sparrow also worked at DMS as a behavioral health specialist. [*Id*. at 5-6.]  Defendant Eric Friedlander served as the Secretary of the Cabinet at the time of the termination, which is the parent agency of DMS. [*Id*. at 6-7.]  Winter Garden was also dis-enrolled as a Medicaid provider on July 31, 2023. [*Id*. at 11; R. 3-1 at 1-5; R. 10 at 4.]

The reason for the termination of Eastern Avenue and Winter Garden's Medicaid provider agreements remains a contentious aspect of this litigation.  The Cabinet's states the reason for the termination was due to Eastern Avenue's failure to obtain the proper Level of Care certification from the American Society of Addiction Medicine (ASAM) required for all Medicaid BHSO Tier III providers "on or after July 1, 2021," as required by 907 KAR. [R. 6 at 2.]  The Plaintiffs state that they were given a deadline of July 1, 2022, to obtain the requisite ASAM Level of Certification. [R. 3 at 9.]  Plaintiffs Vernon Pressley and Eastern Avenue also

2

contend that their termination was "[w]ithout notice or warning," that they possessed an adequate ASAM certification, and thus the termination was an arbitrary decision by the Cabinet. [*Id*. at 8.] Plaintiffs further contend that the Cabinet, Sairajeev, and Sparrow "purposefully and intentionally sabotage[d]" Eastern Avenue "by intentionally and negligently misapplying state rules and regulations," and that their acquisition of the ASAM Level of Care certification was thwarted by Sparrow, at the direction of Sairajeev, "email[ing] every Tier 3 Therapist Provider that Eastern Avenue attempted to partner with and strongly advised them to not partner with Eastern Avenue."[2] [*Id*.]  Vernon Pressley and Eastern Avenue suggest, without supporting documentation, that the actions taken by the Cabinet, Sparrow, and Sairajeev were motivated by racial animus, an intent to discriminate against the Pressleys on the basis of their race, and that the Defendants "did not treat any other Medicaid provider in the fashion that it did Vernon." [*Id*. at 9, 19-21.]

The Cabinet "end dated" Winter Garden's Medicaid provider agreement on the same basis – that Winter Garden had failed to obtain the requisite ASAM Level of Care certification as required by 907 KAR. [R. 3-1 at 1-3.]  Here, as well, the Plaintiffs claim that their inability to obtain the requisite certification was the result of communications made by Sparrow and Sairajeev, on behalf of the Cabinet, to Tier III Therapist Providers in the local area. [R. 3 at 11.] Unique to Winter Garden, however, the Plaintiffs further contend that Winter Garden's Medicaid

---

[2] The precise importance of linking with Tier III Therapist Providers was not clearly articulated in the Plaintiffs' Complaint.  However, after reviewing the Parties' briefing, it appears that "linking" with outside Tier III Therapist Providers can provide Medicaid-eligible behavioral health services to patients living in the Tier III BHSO facility. This is an important prerequisite to obtaining the requisite level of ASAM certification.  This appears especially true for BHSO facilities, such as Eastern Avenue and Winter Garden, who do not have Tier III Therapist Providers on staff who can provide those services to residents directly.  Consequently, Eastern Avenue and Winter Garden's inability to "link" with these providers undermined their certification, which in turn, undermined their ability to remain a Medicaid provider under 907 KAR.

provider agreement was "end dated" one week after Chantelle Pressley was named as a witness in Eastern Avenue's administrative appeal. [*Id.*]

Following the termination of their Medicaid provider agreements, Eastern Avenue and Winter Garden appear to have taken different paths to seek recourse. As stated in the Complaint, Eastern Avenue engaged in a Dispute Resolution Meeting with Cabinet officials, which resulted in the Cabinet sustaining the termination on January 31, 2023. [*Id.* at 3.] Vernon and Eastern Avenue timely appealed the termination and appeared before a Hearing Officer, who ultimately recommended that the Secretary of the Cabinet affirm the decision by DMS to terminate Eastern Avenue's Medicaid provider agreement and dismiss the appeal on February 29, 2024.[3][4] Winter Garden, in contrast, was informed that its "end dating" was not an appealable action. [R. 3-1.] Chantelle Pressley then attempted to revise and re-submit documentation to the Cabinet on five separate occasions, but each attempt resulted in the Cabinet denying her requests for a reinstatement of the Medicaid provider contract, including on a provisional basis. [R. 3 at 12.]

Plaintiffs brought this suit on November 12, 2024, and amended their Complaint on November 19, 2024. [R. 1; R. 3.] Summonses were issued by the Clerk's Office as to the Cabinet, Sairajeev, Sparrow, and Friedlander the following day on November 20, 2024. [R. 5.] There were no additional entries in the record until July 8, 2025, when this Motion to Dismiss was filed. [R. 6.]

---

[3] The Plaintiffs, in Paragraph 55 of the First Amended Complaint, and in their Response to this Motion to Dismiss, that they received a favorable finding from the hearing officer and initially only included a single paragraph from the Hearing Officer's Recommended Disposition in the Complaint. The Plaintiffs included a full copy of the Recommended Disposition as an exhibit affixed to their Response briefing. Although this paragraph suggests a single favorable legal conclusion reached by the Hearing Officer, it does not suggest, as Plaintiffs seem to contend, a favorable outcome. Rather, when no longer read in isolation, it is clear that the Hearing Officer recommended that the termination be upheld and that the administrative appeal be dismissed.

[4] During the pendency of this Motion to Dismiss before the Court, the Plaintiffs also filed a Motion for Preliminary Injunction on December 5, 2025. In response, the Defendants provided the Court with a copy of a Final Order, dated November 7, 2025, by which current Cabinet Secretary Steven J. Stack adopted the Hearing Officer's Recommended Order and affirmed the decision by DMS. [R. 14-2.] This Order was appealable in state circuit court within 30 days, pursuant to KRS 13B.140(1), and the Defendants aver that no such appeal was timely filed.

4

Additionally, while this Motion to Dismiss was before the Court, the Plaintiffs filed a Motion for a Preliminary Injunction on December 5, 2025. [R. 11.]  Plaintiffs filed a second, duplicative Motion for Preliminary Injunction on December 22, 2025, erroneously contending that the Cabinet had failed to respond in the time required under Local Rule 7.1(c). [R. 13.]  On February 11, 2026, a motion hearing was held before the undersigned, and counsel for the Parties provided oral argument on both the Motion to Dismiss and the Motions for Preliminary Injunction. [R. 17.]  These Motions are also now ripe for the Court's review.

## II

### A

The Defendants first contend that several of the Plaintiffs claims are barred by sovereign immunity and must be dismissed without leave to refile.  The Eleventh Amendment bars suits against states and state agencies in federal court unless a state legislature has waived immunity or has consented to being sued in federal court. See *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66 (1989); *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008).  It is "inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Hans v. Louisiana*, 134 U.S. 1, 13 (1890).  The Eleventh Amendment protects states against all types of claims, "whether for injunctive, declaratory, or monetary relief." *Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993); see also *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012).

There are three recognized exceptions to this immunity under the Eleventh Amendment. First, Congress may abrogate a state's sovereign immunity by exercising its Fourteenth Amendment powers. *Alden v. Maine*, 527 U.S. 706, 756 (1999).  Second, a state may choose to waive its immunity. *Sossamon v. Texas*, 563 U.S. 277, 284-85 (2011).  Lastly, and relevant here,

under *Ex Parte Young*, officials acting in derogation of Constitutional safeguards "may be enjoined by a Federal court of equity from such action." 209 U.S. 123, 155-56 (1908). There are two requirements to fall within the *Ex Parte Young* exception: (1) the plaintiff must be seeking "prospective relief that ends a continuing violation of federal law"; *Cooperrider v. Beshear*, 2023 U.S. Dist. LEXIS 49386, at *6 (E.D. Ky. Mar. 23, 2023) (citing *Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002); (2) the state officials must have "some connection" to that ongoing violation. *Id*. (citing *Ex Parte Young*, 209 U.S. at 157-59).

### 1

Counts One and Two of the First Amended Complaint appear to be the product of some confusion regarding litigation with the government and the available remedies. As written, these claims are purportedly brought pursuant to 42 U.S.C. § 1983 by the Plaintiffs against Sairajeev in her official capacity. The alleged constitutional violation in the heading is phrased as a "taking without due process – Fourteenth Amendment," which, when viewed in light of later paragraphs of the Counts, can be fairly construed as a purported violation of both procedural and substantive due process under the Fourteenth Amendment. [R. 3 at 12, 14.] In terms of the relief sought, the First Amended Complaint states that the Plaintiffs are "entitl[ed] … to injunctive and equitable monetary relief." [*Id*. at 13, 16.] Thus, it appears that the Plaintiffs seek both injunctive and monetary relief from Defendant Sairajeev in her official capacity under Counts One and Two of the Complaint.

### a

Sovereign immunity squarely prohibits any claims by Plaintiffs against Defendant Sairajeev in her official capacity seeking monetary damages. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's

office." *Will*, 491 U.S. 58 at 71.  Thus, in effect, such a suit is "no different from a suit against the State itself." *Id*.  Consequently, because suits against the state for monetary relief are squarely barred, absent abrogation or waiver, such suits against a state official are likewise barred by sovereign immunity under the Eleventh Amendment.  Plaintiffs point to no law, nor is the Court aware of one, by which the Commonwealth has waived its sovereign immunity in this context.  Thus, insofar as the First Amended Complaint seeks monetary damages against Defendant Sairajeev in her official capacity under Counts One and Two, pursuant to 42 U.S.C. § 1983, such a claim is barred by sovereign immunity.

**b**

Whether the Plaintiffs are barred by sovereign immunity from bringing a suit for injunctive relief against Defendant Sairajeev in her official capacity is resolved by determining whether the *Ex Parte Young* exception applies.  As already stated, *Ex Parte Young* claims can only provide prospective relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  A court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 645 (2002).  Courts must "look to the substance of the legal claim, not its formal description."  *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir. 2008).  "Declaratory relief is not prospective as required by the *Ex Parte Young* doctrine when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective." *Tigrett v. Cooper*, 855 F. Supp. 3d 733, 744 (W.D. Tenn. 2012).  Consequently, the narrow exception under *Ex Parte Young* "does not permit judgments against state officers declaring they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

Here, the Plaintiffs procedural Due Process claims fail to allege an "ongoing violation of federal law" or seek prospective relief with respect to a procedural due process violation.  The Plaintiffs contend that Defendant Sairajeev deprived the Plaintiffs of their license "without the opportunity to be heard." [R. 3 at 13, 14.]  Insofar as Counts One and Two allege a violation of procedural due process, the *Ex Parte Young* exception does not apply, because the enforcement action was complete upon the termination of the Medicaid Provider contract.  See e.g. *Cooperrider v. Woods*, 127 F.4th 1019, 1044 (6th Cir. 2025) ("the allegedly inadequate process of which Cooperrider complains – that is, the process afforded him prior to the revocation of Brewed's license – concluded when the license was revoked"); see also *Mich. Interlock, L.L.C. v. Alcohol Detection Sys., L.L.C.*, 360 F. Supp. 3d 671, 677-78 (E.D. Mich. 2018) (finding no ongoing violation of federal law after the plaintiffs "were deprived of their [procedural Due Process] rights" but did not allege "future procedural due process violations").

"[S]tate officials may commit 'ongoing' violations when they unconstitutionally retain possession of a person's identifiable property." *Mikel v. Quin*, 58 F.4th 252, 257 (6th Cir. 2023).  Plaintiffs also allege – albeit opaquely – that Defendant Sairajeev has violated their substantive due process protections by revoking both Eastern Avenue and Winter Garden's Medicaid provider contracts, which remain terminated.  Furthermore, the First Amended Complaint seeks prospective relief in the form of the reissuance or restoration of that agreement.  Assuming, arguendo, that the Plaintiffs do, in fact, have a legally protected property interest in the now-terminated Medicaid contracts, their *continued* deprivation would constitute an "ongoing violation of federal law." (emphasis added)  And, undoubtedly, Defendant Sairajeev has well more than "some connection" to such an ongoing deprivation, given her position with the Cabinet, sufficient to fall within the *Ex Parte Young* exception.

8

Consequently, because the Plaintiffs' substantive due process claims fall within the *Ex Parte Young* exception, the doctrine of sovereign immunity does not bar the Plaintiffs from pursuing injunctive relief against Defendant Sairajeev in her official capacity provided they plausibly state a claim of the violation of their substantive due process rights.[5]

**2**

The Court can quickly dispense with the Plaintiffs' Third Cause of Action, insofar as it seeks to bring an action against the Cabinet for *Monell* liability under 42 U.S.C. § 1983.  Under what is known as *Monell* liability, "a local government may be held liable where 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Franklin v. Franklin County, Ky.*, 2023 WL 1978907, at \*7 (E.D. Ky. Feb. 13, 2023) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  But the scope of *Monell* liability is relatively narrow; it applies only to § 1983 actions brought against municipalities. The sovereign immunity of the Eleventh Amendment, "also extend[s] to departments and agencies of states, as well as 'state instrumentalities.'" *Jackson v. Univ. of Kentucky*, 2016 WL 3951084, at \*2 (E.D. Ky. July 20, 2016) (quoting *Pennhurst,* 465 U.S. at 101).

---

[5] In its Motion to Dismiss, the Cabinet argues that Counts One and Two, brought pursuant to 42 U.S.C. § 1983 are time-barred. [R. 6 at 9-11.]  We need not address this argument here, however.  Insofar as these claims seek monetary damages from Defendants in their official capacities, they are squarely barred by sovereign immunity, regardless of when the claims were filed.  Likewise, insofar as the Plaintiffs seek retrospective injunctive relief against Defendants in their official capacities, the *Ex Parte Young* exception does not apply, and such claims are likewise barred by sovereign immunity, regardless of when the claims were brought relative to the injury date.  But, where the Plaintiffs seek injunctive relief as to an allegedly *ongoing* deprivation of substantive due process rights, seeking prospective injunctive relief, such a claim is not time-barred, because the injury is both present and will continue into the future absent a judicial remedy.  Thus, the ongoing nature of the injury in such a scenario not only triggers the *Ex Parte Young* exception to sovereign immunity; it also negates the time-barred argument as well.

In the Third Count of the First Amended Complaint, the Plaintiffs seek to bring a claim for *Monell* liability against the Cabinet, specifically for "final act of policy maker, ratification, & failure to train." [R. 3 at 15-17.]  Plaintiffs are barred from doing so, however, principally because the Cabinet is not a municipality, but rather an agency of the state government. Consequently, the state agency is shielded by the Commonwealth of Kentucky's broader sovereign immunity. *Davis v. Ky. Cmty. & Tech. College Sys.*, 2018 U.S. Dist. LEXIS 64934, at *5 (E.D. Ky. Apr. 18, 2018) (citing *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) ("Eleventh Amendment immunity shields both states and their agencies from suit").  Thus, the Third Count must be dismissed on this basis.

**B**

Qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court asks two question to determine whether an official is entitled to qualified immunity: (1) "Taken in the light most favorable to the party asserting injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) was that right "clearly established … in light of the specific context of the case?" *Crosby v. University of Kentucky*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "A plaintiff must satisfy both prongs to demonstrate that the defendant is not entitled to qualified immunity." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017). Once a defendant raises the qualified immunity defense, "the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation 'that every reasonable official

would have understood that what he [was] doing violate[d] that right.'" *Thomas v. Plummer*, 489 F.App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The Sixth Circuit has cautioned, however, that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Cooperrider v. Woods*, 127 F.4th 1019, 1036 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). And while "qualified immunity is a threshold question to be resolved at the earliest possible point in the proceedings," the Sixth Circuit has warned that such a point "is usually summary judgement and not dismissal under Rule 12." *Id*. (citing *Wesley*, 779 F.3d at 433-34). This reason for this restraint is that at the motion to dismiss stage, it is generally unclear "whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not for purposes of determining whether a right is clearly established." *Id*. (quoting *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019). Generally, then, "so long as the plaintiff states a plausible claim for relief," qualified immunity should be denied at the motion to dismiss stage. *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020).

The Cabinet contends that Defendants Sairajeev and Sparrow, sued in their individual capacities under Counts Four and Five of the First Amended Complaint, are entitled to qualified immunity. [R. 6 at 15-19.] The Cabinet further posits that Defendant Friedlander, sued in his individual capacity under Count Eight of the First Amended Complaint, is also entitled to qualified immunity. [R. 6 at 17-18.] Consequently, the Cabinet also seeks dismissal under Rule 12(b)(6) of Counts Four, Five, and Eight on this basis. [*Id*. at 23.]

We need not, however, set sail upon those waters because the Plaintiffs have inadequately plead a plausible claim with respect to any of the individual capacity claims, for the

11

reasons discussed in greater detail below. Consequently, a more robust qualified immunity analysis at this stage is both unnecessary and unwarranted. This is doubly true where, as here, the Plaintiffs' claims run aground on a procedural basis (i.e., insufficient service of process) as well.

C

Now that this Court has determined that several of the Plaintiffs' claims are jurisdictionally barred as a result of sovereign immunity, we turn now to evaluating whether the Plaintiffs have pled the remaining claims sufficiently to survive a Motion to Dismiss. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must provide grounds for his requested relief that are more than mere labels and conclusions. *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of cause of action will not do." *Id*.

To review a Rule 12(b)(6) motion, courts construe the complaint "in the light most favorable to the plaintiff" and make "all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Id*. (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)). The complaint must enable a court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. To be plausible, a claim need not be probable, but the complaint must show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A complaint that pleads facts that are consistent with but not demonstrative of the defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 556). The moving party

bears the burden of persuading a trial court that the plaintiff fails to state a claim. *Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006).

**1**

Following our sovereign immunity analysis, we are left with a single argument remaining under Counts One and Two – claims against Defendant Sairajeev in her official capacity seeking injunctive relief in the form of a reinstatement of the Medicaid provider agreement, as to both Eastern Avenue and Winter Garden.

"The Fourteenth Amendment provides that states may not deprive any person of life, liberty, or property without due process of law." *Cooperrider v. Beshear*, 2023 U.S. Dist. LEXIS 49386, at *26 (E.D. Ky. Mar. 22, 2023). Under a substantive due process analysis, "deprivations of life, liberty, or property are subject to limitations regardless of the adequacy of the procedures employed." *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003). The protections afforded by the Fourteenth Amendment protect individuals' right to be free from deprivations by the government which are "arbitrary and capricious." *Id.* (citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992)); see also *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) ("[S]ubstantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense").

Judicial review by federal courts examining a challenge to a state administrative action under substantive due process is "extremely narrow." *MSI Regency, Ltd. v. Jackson*, 433 F. App'x 420, 429 (6th Cir. 2011); see also *Stratford v. State-House Inc.*, 542 F. Supp. 1008, 1015-16 (E.D. Ky. 1982) ("Where the right to launch a substantive due process attack on state administrative action does exist, the scope of review of the federal court is extremely narrow").

The Plaintiff must show that "there is no rational basis" upon which the administrative decision can rest. *Id*. The standard is "highly deferential" to the administrative decision, and only "the most egregious official conduct" constitutes a violation of the individual's substantive due process right. *Lewis*, 523 U.S. at 846. Conversely, "[i]f any conceivable legitimate governmental interest supports the contested ordinance, that measure is not arbitrary and capricious and cannot violate substantive due process." *Cooperrider*, 2023 U.S. Dist. LEXIS 49386 at *30 (citing *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 620 (6th Cir. 1997)).

Underlying the narrow scope of proper review of state administrative action in these contexts are questions of federalism. Some years ago, this Court had the opportunity to examine the careful balance federal courts must strike in reviewing state administrative action:

> The use of the terms "arbitrary and capricious" in this context causes considerable confusion, because these same terms are also used to describe the scope of review by state courts of state administrative action. Therefore, it must be emphasized that the state court scope of review of a decision of a state administrative agency is far broader than the federal scope of review under substantive due process. In Kentucky, for example, a state court may set aside state administrative action as being "arbitrary and capricious" on the grounds, among others, that it is not supported by substantial evidence.
>
> No such ground may be used by the federal court in reviewing state administrative action in connection with a federal substantive due process attack, however. In the federal court the standard is a narrow one, to be applied only where administrative action "is not supportable on any rational basis" or where it is "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." The federal court may make only the most limited review of the evidence before the state administrative agency. This review is limited to determining whether the agency has paid attention to the evidence adduced and acted rationally upon it. The state decision may not be set aside as arbitrary and capricious if there is "some factual basis" for the administrative action.
>
> Therefore, it would be extremely rare for a federal court properly to vitiate the action of a state administrative agency as a violation of substantive due process.

> The vast majority of such attacks may readily be disposed of on summary judgment, thus keeping interference by federal courts with state government to a salutary minimum. Review of state administrative action is primarily a matter for the state courts which quite properly have a much broader scope of review under state law.

*Stratford*, 542 F. Supp. at 1015-16 (internal citations omitted). The Sixth Circuit has repeatedly adopted and applied this same reasoning to subsequent cases. See e.g., *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 202 (6th Cir. 1995) ("Therefore, it must be emphasized that the state court scope of review of a decision of a state administrative agency is far broader than the federal scope of review under substantive due process") (quoting *Pearson*, 961 F.2d at 1221). To summarize, federal courts asked to overturn state administrative action under a substantive due process analysis examine the issue with a narrower lens than a state court might employ. Only where an entirely egregious state administrative decision, removed entirely from any lawful basis, has deprived the Plaintiffs of a protected liberty or property interest, may properly find that the state agency violated the Plaintiffs' Fourteenth Amendment safeguards.

The Plaintiffs contend that Defendant Sairajeev violated their due process protections by arbitrarily terminating the Medicaid provider agreement. [R. 3 at 9.] It is quite unclear from the First Amended Complaint what specific government action was arbitrary. But even once we parse through the various possibilities, it is clear that neither Count One nor Count Two plead a claim upon which relief could be granted.

**a**

First, the Plaintiffs contend that the initial termination of Eastern Avenue's Medicaid agreement was founded upon an arbitrary basis.

Next, the Plaintiffs contend that the Cabinet's failure to reinstate Eastern Avenue's provider agreement in the view of a purportedly favorable finding from the administrative

15

hearing officer also constitutes an arbitrary withholding of Plaintiffs' property interest. But this entirely misconstrues the scope and nature of the conclusion reached by the hearing officer. Plaintiffs cite repeatedly to paragraph 10 of the hearing officer's "Recommended Order," to contend that the Cabinet's failure to reinstate the Medicaid provider agreement following issuance of the Order was arbitrary. [R. 3 at 10.] Paragraph 10 provides:

> 10.  DMS has not met its burden of proving that [Eastern Avenue] failed to provide DMS, within the time prescribed by regulation, proof that [Eastern Avenue] possessed an ASAM Level of Care Certification as required by 907 KAR 15:022, Section 3(5)(n)(8)(c).  Given DMS' ultimately determining that [Eastern Avenue] was effectively an alter-ego of Vernon Pressley, and that Pressley was able to produce a certificate of completion of ASAM level of care training (along with other evidence of ASAM coordination), any remaining dispute regarding the sufficiency of [Eastern Avenue's] proof of ASAM Level of Care certification is resolved in favor of [Eastern Avenue].

[R. 9-3, at 8.]  But this paragraph is read entirely out of context.  It comprises a single legal conclusion, among others, made by the hearing officer.  It does not suggest that the termination of the agreement was unlawful, or that reinstatement is proper.  Rather, the Order goes on to recommend "AFFIRMING the decision by the Department for Medicaid Services to terminate the Medicaid provider agreement with Eastern Avenue Sober Living, Inc.," and recommends that the Secretary dismiss Eastern Avenue's appeal. [R. 9-3 at 8.]  Therefore, the Cabinet cannot have arbitrarily decided to refuse reinstatement of the Medicaid provider agreement, when the disposition actually recommended by the hearing officer was to terminate the agreement.  Put differently, the Cabinet did not arbitrarily ignore paragraph 10; rather, the Cabinet's refusal to reinstate was based upon the recommended disposition reached by the hearing officer.  This can hardly be framed, even in the light most favorable to the Plaintiffs as the kind of "egregious state administrative decision" to constitute a substantive due process violation.

**b**

16

Turning next to Count Two, Plaintiffs also fail to plausibly plead a substantive due process violation with respect to Chantelle Pressley and Winter Garden. Again, as stated already, a claim seeking injunctive relief against a defendant in her official capacity for a past violation of procedural due process is barred by sovereign immunity. Thus, the question becomes: Does the ongoing deprivation of the Medicaid provider agreement between the Cabinet and Winter Garden constitute an arbitrary deprivation of Winter Garden's property interest without any lawful basis? Again, as with Eastern Avenue, we conclude it does not. In fact, the requisite rational basis by which the Cabinet terminated Winter Garden's provider agreement is the same as that proffered for Eastern Avenue – that Winter Garden failed to acquire the requisite ASAM Level of Care certification required by 907 KAR.

As already stated, our substantive due process analysis does not seek to re-weight the evidence considered by the agency in reaching its decision to terminate the Plaintiffs' agreements. It also does not involve an assessment about the interpretation of state administrative regulations, or to review the process by which they were promulgated. Those questions are largely reserved for our colleagues in the state courts. Rather, our analysis is restrained to address whether an agency's administrative action is so arbitrary as to lack any factual underpinnings. Therefore, since the Plaintiffs have failed to adequately plead a substantive due process violation as to either Eastern Avenue or Winter Garden, Counts One and Two must be dismissed under Rule 12(b)(6).

**2**

Under Kentucky law, to prevail on a claim of tortious interference with a prospective business advantage the plaintiff must demonstrate: "(1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy;

17

(3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages." *Seeger Enters. v. Town & Country Bank & Trust Co.*, 518 S.W.3d 791, 797 (Ky. Ct. App. 2017) (citing *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012)). The crux of the analysis is the motive of the interfering party; "[the] party seeking recovery must show malice or some significantly wrongful conduct." *Snow Pallet*, 367 S.W. 3d at 6 (quoting *National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988)). Plaintiffs contend that Defendants Sairajeev and Sparrow arbitrarily and intentionally interfered with their business relationship – specifically, their ability to link with third-party providers – thus, preventing them from obtaining proper ASAM certification. This failure, in turn, resulted in the revocation of their Medicaid provider agreement and additional financial harm.

We need not address whether the Plaintiffs have adequately pled the existence of a valid business relationship or expectancy, because this claim is more squarely resolved by addressing the lack of any improper motive on the part of Sairajeev and Sparrow.[6] The Plaintiffs effectively contend that Defendants Sairajeev and Sparrow interfered with their contractual relationship by "emailing Tier 3 Therapist Provider and telling them not to link with [Eastern Avenue]," and by "not properly implementing 907 KAR." [R. 3 at 17.] With respect to Winter Garden, Plaintiffs contend that Sparrow and Sairajeev interfered by "terminating [Winter Garden's] contract, not providing an opportunity to appeal and then arbitrarily denying every application to reapply for its Medicaid contract." [*Id.*]

---

[6] It is worth noting that the Plaintiffs do not make clear specifically what business relationship Defendants Sairajeev and Sparrow interfered. The construction of the complaint appears to suggest, at times, an interference with the business relationship between Eastern Avenue, Winter Garden, and the Cabinet for Health and Family Services. At other times, it appears to suggest an interference with the business relationship between Eastern Avenue, Winter Garden, and the Tier 3 Therapist Provider(s). Either way, however, the complaint still fails to adequately plead a plausible claim for tortious interference.

18

First, and perhaps most fatally, the Plaintiffs fail to point to any factual basis to support the assertion that Sairajeev and Sparrow maliciously or wrongfully interfered with the business relationship, as to either Winter Garden or Eastern Avenue. The Plaintiffs' exhibits include an email exchange between Sparrow and a Tier 3 Therapist Provider. [R. 3-1.] This email exchange, however, fails to demonstrate any wrongful or malicious conduct by Sparrow or Sairajeev. On the contrary, the emails consist of nothing more than a recitation of administrative regulations, in response to a neutrally-phrased question of policy. The emails make no mention of the Pressleys, Eastern Avenue, or Winter Garden. And while paragraph 110 of the First Amended Complaint states "Sairajeev, and Sparrow motive was improper and caused [Eastern Avenue and [Winter Garden] significant harm," merely saying so does not establish a plausible factual basis. [R. 3 at 17.]; see also *Venema v. West*, 133 F.4th 625, 640 (6th Cir. 2025) (Nalbandian, J., dissenting) ("Even on a motion to dismiss, merely saying something doesn't make it so"). And, without any demonstration of improper motive, let alone any significantly wrongful conduct on the part of either Sparrow or Sairajeev, there is not a plausible claim for tortious interference with a business relationship. Consequently, Count Four must be dismissed.

Additionally, the First Amended Complaint falls short of plausibly demonstrating that the actions of Sparrow or Sairajeev caused the purported tortious interference. Rather, the plaintiffs' pleading of this element is perhaps best described as "*res ipsa*-esque." In essence, the Plaintiffs claim that because Sairajeev and Sparrow purportedly misinterpreted 907 KAR and shared that misinterpretation with Tier 3 Therapist Providers inquiring about the regulation, then certainly the communication must be the cause of the Providers' decision not to partner with Eastern Avenue or Winter Garden. Again, this is a legal conclusion lacking a factual basis. There are no facts pled to plausibly indicate that this was the cause of the Providers' decision not to "link,"

19

with the Pressleys.  Rather, a far more plausible justification was presented by the Medicaid

hearing officer's findings during the administrative review:

> 22.  As described by DMS, the obstacle created by [Eastern Avenue] not employing its own therapist was that when [Eastern Avenue] used its Medicaid billing number to bill a patient/Medicaid recipient for residential treatment services, other providers were prohibited from using their own Medicaid billing number to bill the same patient for any other therapeutic services on the same day.
> 23.  While [Eastern Avenue] had at one point a linkage agreement with at least one therapy provider … , that provider's inability to separately bill for therapeutic services under its own Medicaid billing eventually led to a dissolution of the relationship with [Eastern Avenue].

[R. 9-3 at 5.]  In contrast, the Plaintiffs urge the Court to fill the factual void with an assumption

that Sparrow's email to a single provider, by itself, caused all third-party providers to refuse to

link with Eastern Avenue or Winter Garden, which in turn resulted in their failure to secure

proper accreditation and ultimately to lose their Medicaid agreement.  This stretches the *Iqbal*

pleading standard beyond "plausibility," and into mere possibility or speculation.  Consequently,

because of the lack of any facts to demonstrate that Sparrow's email caused the Providers not to

link – other than the mere fact that the email was sent – it is apparent that the causation element

is also lacking.  Dismissal of Count Four is proper, then, because both the causation and

improper motive elements have been inadequately plead in the First Amended Complaint.

**3**

The Plaintiffs next, under Count Five, seek to bring a common law negligence claim

against Defendants Sairajeev and Sparrow in their individual capacities, seeking monetary

damages. [R. 3 at 18-19.]  The Cabinet correctly contends, however, that the Plaintiffs have not

plausibly pleaded a viable negligence claim under Kentucky law.

Under Kentucky law, a plaintiff must show "(1) a duty on the part of the defendant; (2) a

breach of that duty; and (3) consequent injury." *Mullins v. Commonwealth Life Ins. Co.*, 839

20

S.W.2d 245, 247 (Ky. 1992).  The "consequent injury" prong considers two elements: "actual injury and legal causation between the breach and the injury." *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 542 (Ky. Ct. App. 2013) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003).  Particularly relevant here, Kentucky courts long held that "a cause of action in tort requires a present physical injury to the plaintiff." *Wood v. Wyeth-Ayerst Labs*, 82 S.W.3d 849, 852 (Ky. 2002); see also *Louisville & N.R. Co. v. Roberts*, 269 S.W. 333, 334 (Ky. 1925) (refusing to grant recovery for "fright" without any physical impact); see also *Kentucky Traction & Terminal Co. v. Roman's Guardian*, 23 S.W.2d 272 (Ky. 1929) (same). The Kentucky Supreme Court has retreated from this position in recent years, abandoning the so-called "impact rule" and allowing recovery for some emotional damages in the absence of physical harm, but still requiring a high evidentiary bar. *Osborne v. Keeney*, 399 S.W.3d 1, 17-18 (Ky. 2012) ("[R]ecovery should be provided only for 'severe' or 'serious' emotional injury. A 'serious' or 'severe' emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case").

But even while the Kentucky courts have expanded the scope of negligence liability to encompass forms of mental anguish, they have not gone so far as to recognize the sort of claim that Plaintiffs seek to bring here, seeking damages for strictly economic harm.  Justice Keller of the Kentucky Supreme Court explained the rationale behind this "economic loss rule":

> The "economic loss rule" is a judicially created doctrine that marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others.  "The crux of the doctrine is not privity but the premise that economic interests are protected, if at all, by contract principles." … [T]he economic loss rule "has evolved into a modern, general prohibition against tort recovery for economic loss."

21

*Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 583-84 (Ky. 2004) (Keller, J., concurring) (internal citations omitted).  So, although a plaintiff can bring a negligence suit against a government actor in their individual capacity, on the basis that they negligently violated a state statute or regulation, the allegedly negligent act must have still resulted in a legally viable injury – i.e., physical or mental anguish – to the plaintiff.  In short, the scope of a traditional common law negligence cause of action does not sweep so broadly as to permit recovery for a strictly economic harm.

Here, the Plaintiffs also rely on several conclusory or speculative assertions to form the basis of their negligence claim.[7]  Plaintiffs begin by discussing the legal duty, stating that "Sairajeev, and Sparrow both had a duty to treat [Eastern Avenue] and [Winter Garden] fairly and to administer 907 KAR properly." [R. 3 at 18.]  Plaintiffs next turn to the breach element stating, with respect to Eastern Avenue, "Sairajeev and Sparrow breached their duty to [Eastern Avenue] by prematurely determining that [Eastern Avenue] needed to CARF, not properly implementing 907 KAR, and then emailing Tier 3 Therapist Provider and telling them not to link with [Eastern Avenue]." [*Id.*]  And with respect to Winter Garden, they state "Sairajeev and Sparrow breached their duty to [Winter Garden] by not properly implementing 907 KAR, terminating [Winter Garden's] contract, not providing an opportunity to appeal and then arbitrarily denying every application to reapply for its Medicaid contract." [*Id.*]  Finally, addressing injury, Plaintiffs state "Sairajeev and Sparrow's actions were the direct and proximate cause of the harm to [Eastern Avenue] and [Winter Garden]," and as a result of Defendants' acts

---

[7] Plaintiffs also appear to have mislabeled paragraph 112 in incorporating "paragraphs 21 through 60" as to provide the factual underpinning of their negligence claim.  If that were the case, only the first portion of the facts related to Plaintiff Chantelle and Winter Garden would be incorporated and considered herein.  But, even considering the full factual recounting for Winter Garden, the Plaintiffs still fall short of pleading a plausible claim.

22

or lack thereof, "[Eastern Avenue] and [Winter Garden] have been harmed, thereby entitling them to monetary relief." [*Id.*]

Aside from the fact that many of the statements related to duty and breach are conclusory, the negligence claim must necessarily fail because it fails to sufficiently plead a viable injury. The Plaintiffs claim, in effect, that they suffered economic harm as a result of the Defendants allegedly negligent application of state regulations. [R. 3 at 10.] ("Vernon and Chantelle were directly impacted by [the termination] because they no longer had any income"). They do not, however, plead that they suffered any physical harm or severe mental anguish to establish the basis of a viable injury under a negligence claim.[8] Rather, they plead mere economic harm. Assuming, arguendo, that the Defendants did negligently perform their duties and misapplied the state regulations, causing economic harm to Plaintiffs, this still does not establish a plausible negligence claim under Kentucky law. Consequently, Count Five must be dismissed under Rule 12(b)(6).[9]

**4**

The Plaintiffs next allege a cause of action against the Cabinet, and Defendants Sairajeev and Sparrow in their official capacities, for racial discrimination in violation of Title VI of the Civil Rights Act of 1964. [R. 3 at 19-20.] Title VI provides that, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Congress has abrogated states' sovereign

---

[8] It should be noted that at several other points in the First Amended Complaint, the Plaintiffs do allege that they suffered "anguish, humiliation, distress, inconvenience, and loss of enjoyment of life," as a result of Defendants' conduct. However, this is not stated with respect to the negligence claim, nor is it incorporated as such.

[9] This issue is in addition to the Plaintiffs' failure to properly serve Defendants Sairajeev and Sparrow in their individual capacities, meriting dismissal under Rule 12(b)(5), discussed in greater detail below.

immunity under Title VI, provided that the state agency is the recipient of Federal financial assistance. 42 U.S.C. § 2000(d)-7(a)(1); see *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000), cert. denied 533 U.S. 949 (2001) (upholding the Constitutionality of 42 U.S.C. § 2000d-7(a)(1) as a valid exercise of Congress's spending power under Section 5 of the Fourteenth Amendment).  Importantly, Section 601 of Title VI "prohibits only intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("[§ 601] proscribes only those racial classifications that would violate the Equal Protection Clause of the Fifth Amendment").

First, and foremost, the Plaintiffs are unable to bring this action against Defendants Sairajeev and Sparrow in their official capacities.  Claims alleging discrimination under Title VI can only be brought against "the entity … receiving the financial assistance." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1357 (6th Cir. 1996).  Since the Plaintiffs properly named the Cabinet as a defendant on this Count, which is not barred by sovereign immunity, a claim against the Official Capacity Defendants is "superfluous." See e.g., *Foster v. Michigan*, 573 Fed. App'x 377, 389-90 (6th Cir. 2014); see also *Faith Baptist Church v. Waterford Twp.*, 522 Fed. App'x 322, 327 (6th Cir. 2013) ("Having sued … the entity for which [plaintiff] was an agent, the suit against [plaintiff] in his official capacity was superfluous").

Turning to the substance of the First Amended Complaint, the Plaintiffs have failed to articulate a plausible claim of Title VI violations based on the actions of Defendants Sairajeev and Sparrow.  Once again, this claim is hobbled by numerous conclusory and speculative statements that fall well short of presenting a plausible claim upon which relief could be granted. Plaintiffs begin by stating that the two individual Plaintiffs – Vernon and Chantelle – are African-Americans, and by stating that the Cabinet is a recipient of federal financial assistance.

24

[R. 3 at 19.] This lays the initial groundwork for bringing us within the scope of Title VI. Four assertions form the basis for the Plaintiffs claim that they suffered actionable racial discrimination under Title VI. Plaintiffs first state that Defendants Sairajeev and Sparrow "treated Vernon and Chantelle differently based on their race." [*Id*.] The Plaintiffs continue in the next paragraph, stating that "Vernon and Chantelle were discriminated against by Sairajeev and Sparrow as they were singled out based on her race and forced to endure mistreatment that other Medicaid Providers did not face." [*Id*.] Next, Plaintiffs state "CHFS was deliberately indifferent to the racial discrimination occurring which allowed for intentional racial discrimination to continue without recourse." [*Id*.] Lastly, Plaintiffs contend, "Vernon and Chantelle were treated differently than their white counterparts and were denied equal opportunities and benefits." [*Id*.]

"[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief." *Nali v. Ekman*, 355 Fed. App'x 909, 913 (6th Cir. 2009) (citing *Iqbal*, 556 U.S. at 680). That is precisely the case here. Although it is true that the Plaintiffs are members of a racially suspect classification in view of the Equal Protection Clause, that alone is insufficient to demonstrate "a claim of racially motivated discrimination." *Foster*, 573 Fed. App'x at 388-89 (citing *Rondigo, L.L.C. v. Twp. Of Richmond*, 641 F3d 673, 680-81 (6th Cir. 2011)). The remaining statements from the First Amended Complaint are conclusory assertions made in the absence of a supporting factual basis. The First Amended Complaint contains no evidence or factual assertions that Vernon and Chantelle "were treated differently from their white counterparts," or that they "were singled out based on her race." Without any trace of supporting facts to

25

demonstrate such discriminatory conduct, bald assertions that discrimination has occurred cannot form the basis of a viable claim.

Furthermore, even if the Plaintiffs had articulated a plausible claim based on the actions of Sairajeev or Sparrow – which they have failed to do – this would still fall short of establishing Title VI liability of the Cabinet under a *respondeat superior* theory. In order to bring an action against a supervisory entity under Title VI, the plaintiff must show that the state agency "participated in, was aware of, or was deliberately indifferent to … discriminatory acts." *Foster*, 573 Fed. App'x at 389.[10] Again, the First Amended Complaint lacks a factual basis to demonstrate how the Cabinet was aware of the alleged discriminatory acts or was deliberately indifferent in addressing them. Merely stating that the Cabinet was "deliberately indifferent," amounts to a bare recitation of the requisite elements, rather than pleading facts sufficient to establish a plausible claim. Thus, the Title VI claim must be dismissed.

**5**

The Plaintiffs' Section 1981 claim also falls short, without even needing to reference the specific factual allegations contained within the Complaint, because Section 1981 is not the proper recourse for the remedies the Plaintiffs seek. [R. 3 at 20-21.] 42 U.S.C. § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other … The rights protected by this section are protected against

---

[10] In reaching this conclusion in *Foster*, the Sixth Circuit relied heavily on the Supreme Court's opinion in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). In *Gebser*, the Court "held that vicarious liability was not available under Title IX and that a supervisory entity must have had knowledge of and been deliberately indifferent to an employee's discriminatory actions." *Foster*, 573 Fed. App'x at 389 (citing *Gebser*, 524 U.S. at 286-88). In reaching this conclusion, the Court explicitly noted that Title IX and Title VI "operate in the same manner." *Id*. Thus, applying intra-textual interpretation, the Sixth Circuit applied *Gebser*'s rationale to a Title VI case in *Foster*.

impairment by nongovernmental discrimination and impairment under color of State law.

*Benton v. City of Louisville Family Court*, 2014 U.S. Dist. LEXIS 114080, at *6-8 (W.D. Ky. Aug. 15, 2014) (quoting 42 U.S.C. § 1981(a), (c)).  Courts have made clear, however, that "42 U.S.C. § 1983 is the exclusive mechanism for bringing suits against state actors for violation of rights guaranteed by 1981." *Id*. (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 711-31 (1989)); see also *Grinter v. Knight*, 532 F.3d 567, 577 (6th Cir. 2008) ("§ 1983 provides an exclusive remedy for violations against state actors sued in their official capacities" and "[a]n official capacity lawsuit against … a state actor, for constitutional violations, such as race discrimination, cannot be brought under § 1981"); *Arendale v. City of Memphis*, 519 F.3d 587, 598-99 (6th Cir. 2008) ("Accordingly, we hold that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units'") (quoting *Jett*, 491 U.S. at 733).

Count Seven of the First Amended Complaint falls squarely within this precedent, and thus cannot proceed.  Here, Plaintiffs Vernon and Chantelle seek to bring a Section 1981 claim against the Cabinet and Defendants Sairajeev and Sparrow in their official capacities, for "race discrimination in a contract," and seeking compensatory damages, punitive damages, and attorney's fees. [R. 3 at 21.]  Put simply, this is an official capacity lawsuit against state actors, and a state agency, for alleged constitutional violations (i.e., race discrimination).  This cannot be brought as a Section 1981 claim, as pled here, and must be brought, if at all, under Section 1983.[11]  Thus, Count Seven of the First Amended Complaint must be dismissed.

---

[11] It should be noted that if Count Seven were brought as a Section 1983 suit on the same basis against the same Defendants, there would also be several issues with sovereign immunity and, potentially, qualified immunity pursuant to the discussion on those topics above.

**6**

In the Eighth and final Count of the First Amended Complaint, the Plaintiffs seek to bring a supervisory liability claim against Defendant Friedlander in his individual capacity under 42 U.S.C. § 1983. [R. 3 at 22-23.]  The Cabinet correctly contends that even if you were to construe all factual assertions by the Plaintiffs as true, this falls well short of plausibly pleading a supervisory liability claim against Friedlander.

In order to bring a viable claim under a supervisory liability theory under § 1983, two concepts are critically important: "active involvement by the supervisor and causation." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021).  In terms of active involvement, the plaintiff must demonstrate that "a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  Put differently, the "[p]laintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors."  There must be "some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).  Thus, to summarize, "a plaintiff must plausibly allege that a supervisory defendant 'authorized, approved, or knowingly acquiesced in the unconstitutional conduct … of his subordinates through the execution of his job functions.'" *Crawford*, 15 F.4th at 761 (quoting *Peatross*, 818 F.3d at 242).

The causation analysis is itself a two-pronged inquiry, as the "active unconstitutional behavior" of the supervisor must be "both a cause in fact and a proximate cause of the alleged

28

injury." *Id*. (citing *Garza*, 972 F.3d at 868).  Determination of the cause-in-fact prong is resolved by applying the but-for test, "which requires us to imagine whether the harm would have occurred if the defendant had behaved other than he did."  *Garza*, 972 F.3d at 868 (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir, 2007)).  Proximate cause, on the other hand, "demand[s] … some direct relation between the injury asserted and the injurious conduct alleged." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624 (6th Cir. 2019) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)).  "In supervisory liability cases, we have drawn this line at the point where the supervisor's 'active unconstitutional conduct' 'could be reasonably expected to give rise to just the sort of injuries that occurred.'" *Crawford*, 15 F.4th at 762 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012)).

But, as *Crawford* makes clear, "supervisory liability also has sharp limits."  *Id*. at 761.  For example, "a mere failure to act," is insufficient to establish supervisory liability. *Peatross*, 818 F.3d at 241.  This also "requires more than negligence or recklessness." *Crawford*, 15 F.4th at 761 (citing *Garza*, 972 F.3d at 866).  "[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional right of another." *Id*. (citing *Peatross*, 818 F.3d at 241); see also *Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) ("[L]iability cannot be imposed on a supervisor under 1983 based on the theory of respondeat superior").

This is precisely how the Plaintiffs have sought to plead a supervisory liability claim against Defendant Friedlander, who served as the Secretary of the Cabinet for Health and Family Services at the time the Plaintiffs' Medicaid provider agreements were terminated.  In essence, the Plaintiffs claim that Friedlander was aware of the allegedly unconstitutional acts Sairajeev

29

and Sparrow were undertaking, that Friedlander "failed to act," and that his conduct was "the moving force that caused the ultimate injury." [R. 3 at 22.]  Even presuming, for these purposes, that these allegations are entirely accurate, that still does not reach the threshold required for supervisory liability under § 1983.  Rather, this represents the quintessential example of a mere "failure to act"; there is no "active unconstitutional conduct" pled that can give rise to § 1983 liability.

**D**

The Cabinet also seeks partial dismissal of this case for insufficient service of process, as to the Defendants sued in their individual capacities, pursuant to Fed R. Civ. P. 12(b)(5).  First, the Court addresses whether process was served upon Defendants in their individual capacities. If not, the Court will resolve whether an extension of time is either required, or warranted, under the circumstances.

**1**

Even assuming, *arguendo*, that Plaintiffs properly served the Cabinet and Defendants Sairajeev and Sparrow properly by effectuating service upon the Office of the Attorney General, this did not constitute effective service upon Defendants Sairajeev, Sparrow, and Friedlander in their individual capacities.    Under the Federal Rules of Civil Procedure, a plaintiff may serve an individual by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made …" Fed. R. Civ. P. 4(e)(1).  This burden of proof rests squarely with the plaintiff.  *Sawyer v. Lexington Fayette Urban Cnty. Gov't*, 18 F. App'x 285, 287 (6th Cir. 2001).  However, "[s]ervice of an officer in his official capacity does not confer personal jurisdiction over the defendant in his individual capacity." *T.J. v. Franklin Indep. Schs*, 2018 U.S. Dist. LEXIS

30

145329, at *10 (E.D. Ky. Aug. 27, 2018) (citing *King v. Taylor*, 694 F.3d 650, 655-56 (6th Cir. 2012)).

Plaintiffs contend that, in looking to state law, service upon the Attorney General constituted service upon the defendants in both their official and individual capacities. See Ky. C.R. Rule 4.04(6) ("Service shall be made upon the Commonwealth or any agency thereof by serving the Attorney General or any assistant attorney general"). This overinterprets the scope of the state rule. While the Commonwealth was obligated to accept service on behalf of its officials, this responsibility extends only so far as their official capacity reaches. Plaintiffs have neither personally served the individual defendants, nor have they "[left] a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." See Fed. R. Civ. P. 4(e)(2). Furthermore, nothing in the record indicates that the Attorney General was specifically appointed as an agent to accept service on the behalf of the Defendants in their individual capacities; thus, Plaintiffs' service of the Defendants in their individual capacities is deficient.

**2**

Our analysis in evaluating a Rule 12(b)(5) motion is directed by Fed R. Civ. P. 4(m). *Woods v. Morris Mohawk Gaming Grp.*, 2025 WL 3459479, at *7-8 (E.D. Ky. Dec. 2, 2025). Generally, under Rule 4(m), "if a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). But, "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed R. Civ. P. 4(m). Thus, the Court must first "determine whether the plaintiff has shown good cause for the failure to effect service." *Stewart*

31

*v. Tenn. Valley Authority*, 238 F.3d 424 (6th Cir. 2000).  If good cause exists, the Court is required to extend the permitted time for service of process. *O'Brien*, 2025 WL 645870, at *3 (citing *Stewart*, 238 F.3d at 424).  The Sixth Circuit has defined good cause to require "a reasonable, diligent effort to timely effect service of process." *Johnson v. Smith*, 835 F. App'x 114, 115 (6th Cir. 2021).  The gravamen of the determination of good cause is whether "something outside the plaintiff's control prevents timely service." *Thul v. Haaland*, 2023 WL 6470733, at *2 (6th Cir. Mar. 1, 2023), cert. denied, 144 S. Ct. 96 (2023).

Yet, even such "good cause" does not exist, the Court maintains significant discretion in determining whether an extension of time is proper. *Henderson v. United States*, 517 U.S. 654, 662 (1996); see also Fed. R. Civ. P. 4(m).  The Sixth Circuit has set forth a multi-factor analysis to guide district courts in determining whether, in its discretion, an extension of time is merited, even where good cause is lacking:

(1) whether an extension of time would be well beyond the timely service of process;
(2) whether an extension of time would prejudice the defendant other than the inherent prejudice in having to defend the suit;
(3) whether the defendant had actual notice of the lawsuit;
(4) whether the court's refusal to extend time for service substantially prejudices the plaintiff, i.e., would the plaintiff's lawsuit be time-barred;
(5) whether the plaintiff had made any good faith efforts to effect proper service of process or was diligent in correcting any deficiencies;
(6) whether the plaintiff is a pro se litigant deserving of additional latitude to correct defects in service of process; and
(7) whether any equitable factors exist that might be relevant to the unique circumstances of the case.

*United States v. Oakland Physicians Medical Center, LLC*, 44 F.4th 565, 569 (6th Cir. 2022).

First, we can easily conclude that this misinterpretation of legal precedent does not arise to the level of "good cause," as to require this Court to grant an extension of time.  The Plaintiff's failure to serve the Defendants in their personal capacities was, it appears, the direct

32

result of a misinterpretation of the scope of the Federal Rules of Civil Procedure. It is not, however, "something outside the plaintiff's control," requiring this Court to grant an extension. Our attention turns, then, to whether this court should, in view of the aforementioned discretionary factors, grant Plaintiffs an extension of time to cure this defect without dismissing the case. And, in weighing these factors, the proper course of action is to dismiss each individual capacity count.

On the one hand, an extension of time would likely not significantly prejudice the individual defendants, at least not other than having to defend the suit itself; and they almost certainly have actual notice of the pendency of this lawsuit, given that they have also been sued in their official capacities.[12] On the other hand, an extension of time would be well beyond the 90-day deadline for timely service. The First Amended Complaint in this matter was filed more than one year ago, on November 19, 2024.

Nor, as far as the Court can tell from the complaint as currently pled, that dismissing the case with leave to refile would unduly prejudice the Plaintiffs, such as by resulting in a claim being time-barred, that was not already time-barred as of November 2024. Additionally, the Plaintiffs have made no good faith efforts to serve the Plaintiffs, other than by serving the Office of the Attorney General. In sum, the issue here appears to be a biproduct of a misunderstanding as to the proper method of serving government defendants, where the plaintiff brings both official and personal capacity claims. This mistake, however, does not urge this Court to grant a discretionary extension. This is especially true where, as here, the mistaken party is represented by legal counsel. Consequently, Counts Four, Five, and Eight must be dismissed without prejudice for insufficient service of process under Rule 12(b)(5).

---

[12] This, of course, does not include Defendant Friedlander, who is being sued solely in his individual capacity under Count Eight of the First Amended Complaint.

**E**

The Cabinet next contends that while Plaintiffs served a copy of the summons and the Complaint upon the Office of the Attorney General, the Complaint was incomplete because it did not contain the exhibits referenced within the Complaint.  The Cabinet contends that this failure amounts to service of "an incomplete copy of the Complaint," and thus seeks dismissal of the First Amended Complaint under Rule 12(b)(4).

This motion exposes a narrow interpretive gap between two Rules of Civil Procedure, which has been infrequently litigated.  Under Rule 4(c)(1), "[a] summons must be served with a copy of the complaint." Fed. R. Civ. P. 4(c)(1).  Rule 10(c) provides, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).  Under the Cabinet's interpretation, because the exhibits are technically a part of the pleading, a Complaint is incomplete and, thus, ineffective, if it is served without the exhibits affixed thereto.  [R. 6 at 20.]

Courts in the Sixth Circuit which have addressed this issue have rejected such an interpretation. See *Warner v. Hamburgh Prods., LLC*, 2013 U.S. Dist. LEXIS 68215, at *8-10 (E.D. Mich., May 14, 2013).  In *Warner*, the court determined that "[a] dismissal makes no sense in light of Plaintiff's good faith effort to effect proper service of process."  Rather, because the Plaintiff had substantially complied with the requirements of Rule 4(c)(1), and the Defendant "failed to show lack of notice or prejudice, other than the inherent prejudice in having to defend this lawsuit," dismissal on that basis was improper. *Id*.; see also *Fields v. Norfolk and S. Ry. Co.*, 924 F. Supp. 2d 702 (S.D. W. Va. Dec. 14, 2012) ("the Fourth Circuit has recognized that noncompliance with Rule 4 does not mandate dismissal where the necessary parties have

34

received actual notice of a suit and where they have not been prejudiced by the technical defect").

The same logic applies here. While it may be correct that the Plaintiffs failed to include the referenced exhibits along with the First Amended Complaint when they effectuated service upon the OAG, the Cabinet has failed to adequately demonstrate prejudice sufficient to merit dismissal on this basis. Once the Cabinet was served with the summons and complaint, whether in January or June 2025, and noticed that it referenced exhibits that were not affixed, counsel for the Cabinet could have accessed these exhibits by looking at the record. Although the Plaintiffs may have failed to include the exhibits in the copy of the Complaint served on the Defendants, they did include the exhibits when the First Amended Complaint was filed with this Court on November 19, 2024. Put simply, they were still easily accessible to the Cabinet, notwithstanding their not being served upon the Cabinet. Consequently, dismissal on this basis is unwarranted.

**F**

The Cabinet also requests that this Court dismiss the Plaintiffs' action for failure to prosecute. In the Cabinet's view, the Plaintiffs filed the First Amended Complaint on Nov. 19, 2024, then "seemingly did nothing and did not even attempt service of process on the Cabinet for seven months." [R. 6 at 21.] The Cabinet contends that it did not learn of this dispute initially until June 17, 2025, when it contends the Office of the Attorney General was served with the summons and complaint. The Plaintiffs aver that this articulation of the facts is "misleading." The Plaintiffs contend that they served the summons and complaint on the Office of the Attorney General on January 6, 2025, via the OAG's designated email service channel, and received an automated receipt email in response. Thus, the Plaintiffs contend that any delay in the litigation

35

is not attributable to the Plaintiffs' failure to prosecute, but rather to a lack of action taken by the Defendants.

Under Rule 41(b), federal district courts may involuntarily dismiss an action "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order…" Fed. R. Civ. P. 41(b). The purpose of Rule 41(b) is to provide district courts with "a tool to effect management of its docket and avoidance of unnecessary burdens on the tax-supported courts and opposing parties." *Knoll v. AT&T*, 176 F.3d 359, 362-63 (6th Cir. 1999); see also *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629-30 (1962). The district courts, therefore, possess "substantial discretion in serving these tasks." *Id*. at 363. District courts are cautioned to use this discretion sparingly, however. *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 736-37 (6th Cir. 2008); see also *Tung-Hsiung Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2005) ("the dismissal of a claim for failure to prosecute is a harsh sanction which the court should order only in extreme situations showing a clear record of contumacious conduct by the plaintiff").

When the Sixth Circuit evaluates whether a district court's dismissal under Rule 41(b) was proper, it weighs four factors:

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Schafer*, 529 F.3d at 737 (citing *Knoll*, 176 F.3d at 363). Furthermore, the Sixth Circuit has directed that these factors are to "applied more stringently," in situations where, "the plaintiff's attorney's conduct is responsible for the dismissal." Although the Court is endowed with significant discretion in this area, our analysis must be guided by a consideration of these four

36

factors. See e.g., *Wyrick v. Smith*, 2023 U.S. Dist. LEXIS 205390, at *4-5 (E.D. Ky. Nov. 14, 2023).

This is not a case where the evidence demonstrates that a plaintiff rested on its laurels while holding the specter of litigation over the head of the defendant, without taking steps toward final judgment. Rather, there is uncertainty as to who is at fault for the delay in this litigation. The Plaintiffs contend that they served process, via email, on the OAG on January 6, 2025, while the Cabinet contends that service was not effectuated until June 17, 2025. [R. 9 at 11; R. 6 at 21.] This disparity would be more squarely resolved if the Plaintiffs had filed any proof of service into the record.[13] Instead, there were no entries into the record at all from the time in which the Clerk's Office issued summonses on November 20, 2024, and the filing of the Cabinet's Motion to Dismiss on July 8, 2025. As far as the Court was aware, service had not yet occurred, and the case could not proceed.

Turning, then, to the factors. It can hardly be said, in light of the dispute as to when service was effectuated that the delay in litigating the case was the result of "willfulness, bad faith, or fault," of the Plaintiffs. The Cabinet does not contest that email service to the shared inbox was a proper form of service upon both the Cabinet and the official capacity defendants. And the Plaintiffs have presented evidence to show that an email with the summons and complaint attached was submitted to this inbox, and that an automated receipt email was promptly received. While it may have been prudent to notify the Court that service was executed, or even just to provide some status update on the case in the many months that

---

[13] "Valid proof of service on the record creates a rebuttable presumption of valid service." *T.J. v. Franklin Indep. Schs*, 2018 U.S. Dist. LEXIS 145329, at *4-5 (E.D. Ky. Aug. 27, 2018) (citing *Fifth Third Bank v. Mytelka*, 2009 U.S. Dist. LEXIS 61884, at *3 (W.D. Ky. July 10, 2009) (citations omitted); see also *Blair v. City of Worcester*, 522 F.3d 105, 111 (1st Cir. 2008) ("A return of service generally serves as prima facie evidence that service was validly performed").

followed, their failure to do so does not suggest a willful decision not to prosecute the case, or even to suggest that it is the Plaintiffs' fault that the case did not progress.

The Cabinet was not prejudiced by the seven-month delay in the litigation. During this period, it appears that the Cabinet did nothing with respect to this litigation – in fact, they contend that they were unaware of its existence. There could be no harm brought about by the sword of litigation looming overhead, if the Cabinet didn't even know to look up. Additionally, the Plaintiffs were not provided any warning that their failure to prosecute could result in dismissal; rather, there was no communication with the Plaintiffs from either the Court or the Defendants from November 2024 until July 2025. And, as already demonstrated, there are less burdensome remedies other than involuntary dismissal under Rule 41(b) that are available to this Court in this scenario. Consequently, this Court concludes that a Rule 41(b) dismissal is improper at this time.

**G**

Lastly, the Plaintiffs seek leave to amend the Complaint, pursuant to Rule 15(a)(2), "should the Court find any portion of the First Amended Complaint deficient in form or substance." [R. 9 at 13.] In response, the Cabinet contests that "[a]ny effort to amend Plaintiffs' Complaint would be futile and thus would not serve judicial economy," and thus urges the Court to deny leave to amend. [R. 10 at 4-5.] To answer this question, we must examine each Count, with an eye toward each count's specific deficiencies.

The basis for much of the Cabinet's argument that granting leave to re-file the claims is futile, is premised on their contention that many of the Plaintiff's claims are time-barred. Dismissal of a claim under Rule 12(b)(6) for time-barring reasons is relatively narrow, and only proper if "the allegations in the complaint affirmatively show that the claim is time-barred."

38

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). In other words, it must be "apparent from the face of the complaint that the limit for bringing the claim[s] has passed." *Bishop v. Lucent Techs. Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).

The central problem of the Cabinet's futility argument is that, with respect to several of Plaintiffs' claims, the specific date of the alleged injury remains unclear. And, as a result of this opacity, it is challenging or impossible to ascertain whether certain claims are time-barred as currently pled. Consequently, and because there are numerous other deficiencies in the Plaintiffs' complaint which lead this Court to dismiss, we need not delve further into this duplicative question. Based on the information present in the complaint, the Court cannot definitively say that the claims the Plaintiffs seek to bring are futile. Thus, we will not deny the Plaintiffs leave to refile on that basis.

## III

The Court acknowledges and commends both Vernon and Chantelle Pressley for their efforts in combatting the ongoing opioid crisis, and their efforts to assist families who have been affected by it. However, the factual allegations brought forth in the Plaintiffs' First Amended Complaint, construed in the light most favorable to the Plaintiffs, fail to adequately plead a viable claim upon which relief could be granted. Procedural shortcomings regarding service of process with respect to the individual capacity claims further hobble Plaintiffs' case.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1.  Counts One and Two of the Plaintiffs' First Amended Complaint are **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6);

2.  Count Three of the First Amended Complaint is **DISMISSED** with prejudice;

3.  Counts Four, Five, and Eight are **DISMISSED** without prejudice for insufficient service of process and failure to state a claim under Fed. R. Civ. P. 12(b)(6);

4.  Counts Six and Seven are **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted under Fed R. Civ. P. 12(b)(6);

5.  Plaintiffs' Motions for Preliminary Injunction **[R. 11; R. 13]** are **DENIED AS MOOT**.

This the 30th day of March 2026.

Gregory F. Van Tatenhove
United States District Judge